UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Dale Dwayne Greer,
a/k/a "D'Leuchi Morris,"

                    Plaintiff,

        vs.                                    REPORT AND RECOMMENDATION

City of Duluth, Shana
Harris, Dale Marcus,
Unidentified Complainant,
Patricia Behning, and Roger
Waller,

                    Defendants.           Civ. No. 06-0429 (JRT/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


## I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the Motion of Shana Harris ("Harris"), and Dale Marcus ("Marcus"), for Summary Judgment, see Docket No.20, and upon the Motion of the City of Duluth ("City"), Patricia Behning ("Behning"), and Roger Waller ("Waller"), to dismiss this action or, in the alternative, for Summary Judgment. See, Docket No.

14. The Plaintiff appears <u>pro se</u>, and the Defendants appear by M. Alison Lutterman, Deputy Duluth City Attorney.

For reasons which follow, we recommend that the Defendants' Motions for Summary Judgment be granted, and that this action be dismissed with prejudice.

II. <u>Factual and Procedural Background</u>

Shortly before 1:28 o'clock a.m., on November 1, 2003, a 911 operator in Duluth, Minnesota, received a call from a person who reported that an assault was being committed in front of her home. The caller stated that a Black male, who was wearing a white jacket, was beating and kicking a White female, who was wearing a black jacket. The operator who handled the 911 call contacted a Duluth Police dispatcher, who relayed the report to two (2) police officers in the vicinity of the assault. See, <u>Transcript of Second State Omnibus Hearing</u> ("<u>Second Hearing T.</u>"), <u>Docket No. 40-2</u>, pp. 28-31, 47, 58. One of the officers, an Officer Jones ("Jones"), drove directly to the site of the assault, and found the victim. However, the perpetrator had already left the scene on foot. <u>Id.</u> at p. 31. Jones reported back to the dispatcher that the victim was "not being cooperative." <u>Id.</u> at p. 33.

The other officer, who received the report about the assault, was Harris. She had reported for duty at about 6:30 o'clock p.m., on the previous day, and had been

- 2 -

very busy during her shift.  See, <u>Affidavit of Harris</u>, <u>Docket No. 22</u>, pp. 2-3, ¶4.
When Harris received the assault report, she was working on a different matter, and
she was not able to respond immediately.  <u>Id.</u>  At approximately 1:39 o'clock a.m.,
Harris contacted Jones by radio in order to get an update on the assault incident.  <u>Id.</u>
Jones replied that he was with the victim, and he asked Harris to look for the assailant.
<u>Id.</u>; see also, <u>Transcript of First State Omnibus Hearing</u>, Part 1 ("<u>First Hearing T.</u>"),
<u>Docket No. 23-1</u>; <u>First Hearing T.</u>, Part 2, <u>Docket No. 40-1</u>, at p. 59.[1]

About forty (40) minutes later, at 2:17 o'clock a.m., Harris saw a Black man
walking on a sidewalk approximately two (2) blocks east and four (4) blocks south of
the site of the assault.  See, <u>Affidavit of Harris</u>, at p. 3,  ¶5.  The man was wearing a
black jacket, which Harris believed matched "the description that [the] radio had
given" of the suspect in the assault case.  See, <u>First Hearing T.</u>, at p. 9.  Harris
contacted the police dispatcher, and reported that she had located a man who might
be the assailant.  <u>Id.</u>  Harris wanted to talk to the man in order to determine whether
he was, indeed, the suspect.  See, <u>Affidavit of Harris</u>, at p. 3,  ¶5.  She later explained

---

[1]The Transcript of the First State Omnibus Hearing, which was conducted on
January 5, 2004, has been filed in two parts.  Pages 1-35 are Attachment No. 1 to the
<u>First Affidavit of M. Alison Lutterman</u>, <u>Docket No. 23-1</u>, and pages 36-55 are
Attachment No. 1 to the <u>Second Affidavit of M. Alison Lutterman</u>, <u>Docket No. 40-1</u>.
As noted in the text, the entire transcript is identified hereinafter as "<u>First Hearing T.</u>"

that she "rolled down my passenger window and made eye contact with him, and asked him if I could talk to him." See, First Hearing T., at p. 9. In response to her question, the man stopped walking, stood still, and looked at Harris. Id., at p. 12. Harris stopped her squad car, got out, and walked around to the other side of the car, and approached the man, who turned out to be the Plaintiff. Id.

Just before Harris spotted the Plaintiff, a fellow Duluth police officer, Marcus, saw Harris driving her squad car. Although Harris did not contact Marcus, see, Affidavit of Harris, at p. 3, ¶7, Marcus, nevertheless, followed Harris in his own car for a short distance. When Harris pulled over to talk to the Plaintiff, Marcus pulled his squad car to the curb right behind Harris' squad car, in order to provide assistance if needed. See, First Hearing T., pp. 38-39. Marcus remained in his car, and watched as Harris approached the Plaintiff to speak with him. Id.

Harris asked the Plaintiff whether he had been involved in a fight with his girlfriend, and the Plaintiff "irate[ly]" responded: "I don't have a girlfriend. I didn't get in a fight with anyone." See, First Hearing T., at p. 12. Harris informed the Plaintiff about the assault, and said she wanted to speak with him about it. Id.

At some point after Harris stopped her squad car so she could talk to the Plaintiff, Marcus observed the Plaintiff drop something on the ground. See, First

Hearing T., at pp. 40-43.  As Harris was talking to the Plaintiff, Marcus walked up to the object that the Plaintiff had dropped, and picked it up.  Marcus found that the object was a napkin, and when he unfolded the napkin, he discovered that it contained a substance that he identified as crack cocaine.  Id., at pp. 43-44.  Marcus immediately approached the Plaintiff and, without talking to Harris, announced that he was placing the Plaintiff under arrest for possession of crack cocaine.  Id., at pp. 44-45.  The Plaintiff was then taken to jail.  Id.

Although the Plaintiff gave the police officers a false name, see, Police Report, Affidavit of Harris, Docket No. 22-3, they later learned his true identity.  They also discovered that there was an outstanding Arrest Warrant for the Plaintiff.  Id., at p. 4, ¶10.

In the subsequent State criminal case, that resulted from the Plaintiff's apprehension, see, State v. Greer, St. Louis County File No. K8-03-601183, the Plaintiff sought to suppress the evidence obtained by Marcus – namely, the crack cocaine that Marcus had seen the Plaintiff drop.  The Plaintiff argued that Harris did not have any reasonable grounds for approaching him, and for asking him questions, merely because he was wearing a black jacket, and the assault suspect reportedly had been wearing a white jacket.  See, Omnibus Order, Docket No. 23-4, at 1.  Therefore,

the Plaintiff contended, the crack cocaine that was secured during his encounter with

Harris should be suppressed.  Id.

     During an Omnibus Hearing on January 5, 2004, Harris testified that she had

mistakenly believed that the suspect in the assault incident had been described as

wearing a black jacket, rather than a white jacket.[2]  See, First Hearing T., at p. 16.

After that Hearing, the State Court denied the Plaintiff's Suppression Motion.  The

Court explained as follows:

> The Defendant [i.e., the Plaintiff here] raises a suspicion
> that the officer [Harris] is not being truthful about
> mistaking the jacket color and that she did not stop the
> Defendant for any valid reason.  The Court found the
> officer to be a credible witness.  The mistake about jacket
> color under the circumstances of this case, with a report of
> a black person with white jacket and a white person with a
> black jacket, heard by the officer as background noise while
> she is involved in something else, is a believable
> occurrence.  The Defendant was in a place and at a time
> where a reasonable person could expect that the suspect in
> the assault might be, and, at that hour of the morning, there
> would be very few other people around.  The officer was
> doing her duty in a reasonable and responsible manner in
> having the Defendant stop so that she could ask him some
> questions regarding the alleged assault.

Omnibus Order, Docket No. 23-4, at p. 2.

---

[2]Harris testified:  "[The dispatcher] said the male [suspect] was wearing white.
The female [victim] was wearing black and I just kind of mixed it up there."  First
Hearing T., p. 16; see also, Affidavit of Harris, at p. 3, ¶6.

Several weeks later, the Plaintiff renewed his Suppression Motion, arguing that, contrary to what the Court had suggested in its prior ruling, Harris did not hear the description of the assault suspect as "background noise while she [was] involved in something else."  See, <u>Second Hearing T.</u>, at p. 4.  A second Omnibus Hearing was conducted on March 2, 2004, and the evidence presented at that Hearing confirmed that Harris had not heard the suspect description merely as background noise but, rather, the description had been specifically sent to her, and received by her, as one (1) of the two (2) police officers who were assigned to investigate the assault.  See, <u>Second Hearing T.</u>, at pp. 21, 26-27; 55-56; 66-67.

After the second Omnibus Hearing, the Court entered a new Order which granted the Plaintiff's Suppression Motion, and dismissed the pending criminal charges against him.  In the new Order, the Court explained its ruling as follows:

> The [Plaintiff], was wearing the wrong color jacket.  The officer [Harris] was acting in good faith; but there was simply not enough basis on these facts to constitute a 'reasonable suspicion' that the Defendant was the suspect. This would be so even if the jacket color had been right. The Court is not finding that its view of the facts has changed significantly since the last Order.  The Court is concluding that it was mistaken in its analysis of the facts and its prior conclusion.

Omnibus Order, <u>Docket No. 23-5</u>, pp. 2-3, ¶ 3.

Nearly two years after the criminal case was dismissed, the Plaintiff commenced this action, by filing a Complaint seeking relief, under <u>Title 42 U.S.C. §1983</u>, for alleged violations of his Federal constitutional rights.[3]  See, <u>Docket No. 1</u>.

The Plaintiff claims that Harris violated his constitutional rights, under the Fourth and Fourteenth Amendments, when she asked him to stop, so that she could ask additional questions about the assault she was investigating.  See, <u>Plaintiff's Memorandum in Support</u>, <u>Docket No. 26</u>, at p. 1.  In addition, the Plaintiff claims that Marcus violated his constitutional rights, under the Fourth and Fourteenth Amendments, by arresting him without probable cause.  <u>Id.</u> at p. 5.

The Plaintiff is also suing the City, Waller, in his official capacity as the Chief of the Duluth Police Department, and Behning, as the City of Duluth Police Officer who responded to a grievance letter, that the Plaintiff sent to the Duluth Police Department.  The Plaintiff claims that those Defendants violated his constitutional rights by failing to properly train and supervise Harris, and Marcus, and by failing to properly investigate, and resolve, his grievance letter.  <u>Id.</u>, at p. 9-11.  According to the Complaint:

---

[3]When the Plaintiff filed his Complaint, he was confined at the Minnesota Correctional Facility, in Rush City, Minnesota, presumably because of a State criminal conviction that is not directly related to the arrest at issue here.  The Plaintiff remains incarcerated at this time.

> As superior officers, Chief Waller and Lt. Behning were obligated to supervise, train, and discipline subordinate officers, however, they failed to conduct a proper investigation and take disciplinary action for the wrong done to plaintiff. Chief Waller and Lt. Behning's failure to correct the wrong done to plaintiff granted implied consent as to Officers Harris and Marcus violation of plaintiff's civil rights, and denied him due process and equal protection of the law.

Complaint, supra at pp. 6-7, ¶24.[4]

The Plaintiff has not described any specific harm that he suffered as a result of the alleged violations of his constitutional rights, nor has he described any specific relief that he is seeking to recover in this action. He claims only that he is "entitled to civil damage recovery pursuant to 42 USC (1983), resulting [from] the constitutional violation of his Civil Rights by the defendants." See, Complaint, at p. 8.

As previously noted, the Defendants have filed Motions to Dismiss, and/or for Summary Judgment, which are supported by Affidavits and Exhibits that set forth the relevant facts of the case. The Plaintiff has filed a Memorandum in Opposition to the

---

[4]The Plaintiff also attempted to sue Vernon D. Swanum, the Assistant County Attorney who prosecuted the State criminal charges that were brought against him, and Gerald C. Martin, the State Court Judge who dismissed those charges. However, the Plaintiff's claims against those two Defendants have already been dismissed. See Order, Docket No. 8. The Plaintiff's Complaint also alludes to a "conspiracy" involving an unidentified police official. See, Complaint, at p. 4. However, that person has never been joined as a party to this action, and in any event, the Plaintiff has not adequately explained, nor attempted to substantiate, the "conspiracy" claim involving that person.

Defendants' Motions, see, <u>Docket No. 26</u>, but he has not submitted any Affidavits, or other evidence, in opposition to the Motions.[5]

### III.  <u>Discussion</u>

A.    <u>Standard of Review</u>.  Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury in weighing the evidence, and in rendering credibility determinations.  See, <u>Wallace v. DTG Operations, Inc.</u>, 442 F.3d 1112, 1118 (8th Cir. 2006), citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986); <u>Midwest Oilseeds, Inc. v. Limagrain Genetics Corp.</u>, 387 F.3d 705, 711 (8th Cir. 2004), cert. denied, 544 U.S. 977, 125 S. Ct. 1860 (2005).  Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in a light most favorable to the nonmoving party, and we have found no triable issue.  See, <u>Smutka v. City of Hutchinson</u>, 451 F.3d 522, 526 (8th Cir. 2006), citing <u>Mayer v. Nextel W. Corp.</u>, 318 F.3d 803, 806 (8th Cir. 2003); <u>Eide v. Grey Fox</u>

---

[5] Although the Plaintiff's brief is titled "Memorandum of Law," the introductory paragraph of the brief states that he "asserts his motion as a motion for summary judgment pursuant to Rule 56, F.R.Civ.P. * * *."  This language prompted the Clerk's Office to file the Plaintiff's Memorandum as a "Motion," <u>Docket No. 27</u>, as well as a Memorandum.  It is unclear whether the Plaintiff actually intended to seek Summary Judgment, but we find, for reasons that follow, that he is not entitled to Summary Judgment.  Therefore, the Plaintiff's so-called "Motion" should be denied.

Technical Servs. Corp., 329 F.3d 600, 604 (8th Cir. 2003); Philip v. Ford Motor Co., 328 F.3d 1020, 1023 (8th Cir. 2003).  For these purposes, a disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a Verdict for the nonmoving party.  See, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Planned Parenthood of Minnesota/South Dakota v. Rounds, 372 F.3d 969, 972 (8th Cir. 2004); Fenney v. Dakota, Minnesota & Eastern R.R. Co., 327 F.3d 707, 711 (8th Cir. 2003).

As Rule 56(e) makes clear, once the moving party files a properly supported Motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute.  In sustaining that burden, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial."  Rule 56(e), Federal Rules of Civil Procedure; see also, Anderson v. Liberty Lobby, Inc., supra at 256; Eddings v. City of Hot Springs, Ark., 323 F.3d 596, 602 (8th Cir. 2003).  Moreover, the movant is entitled to Summary Judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." Celotex Corp. v. Catrett, supra at 322; see also, Forest Park II v. Hadley, 408 F.3d 1052, 1057 (8th Cir. 2005); Mercer v. City of Cedar Rapids, 308 F.3d 840, 843 (8th Cir. 2002); Hammond v. Northland Counseling Center, Inc., 218 F.3d 886, 891 (8th Cir. 2000).  No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, supra at 323; see also, Sallis v. University of Minnesota, 408 F.3d 470, 474 (8th Cir. 2005); Davis v. U.S. Bancorp, 383 F.3d 761, 768 (8th Cir. 2004); Bell Lumber and Pole Co. v. United States Fire Ins. Co., 60 F.3d 437, 441 (8th Cir. 1995).

B.  Legal Analysis.  The Plaintiff seeks relief under Title 42 U.S.C. §1983, for alleged violations of his Federal constitutional rights.  We first consider the Plaintiff's claims against Harris, then those against Marcus, and finally, the claims against the remaining Defendants -- the City, Waller, and Behning.  For reasons which follow, we conclude that none of the Plaintiff's claims can survive the Defendants' Motions for Summary Judgment.

1.  The Claims Against Harris.  The Plaintiff alleges that Harris violated his rights under the Fourth Amendment, by confronting him while he was walking along a public street, and by asking him questions about a recently reported

crime.  The Plaintiff contends that Harris did not have any reasonable suspicion that

he was involved in the crime that she was investigating, because he was wearing a

black jacket, while the suspected criminal had been reported to be wearing a white

jacket.

As the Plaintiff correctly asserts, the Fourth Amendment guarantees "[t]he right

of the people to be secure in their persons, houses, papers, and effects, against

unreasonable searches and seizures."  See, Plaintiff's Memorandum, supra at p. 2.

The Fourth Amendment is often -- but not always -- implicated when a police officer

encounters a citizen in connection with a criminal investigation.  As our Court of

Appeals has explained:

> Supreme Court jurisprudence has placed police-citizen
> encounters into three tiers or categories.  First, there are
> communications between officers and citizens that are
> consensual and involve no coercion or restraint of liberty.
> Such encounters are outside the scope of the Fourth
> Amendment.  Second, there are the so-called Terry-type
> stops [so named because they were identified and
> sanctioned in Terry v. Ohio, 392 U.S. 1 (1968)].  These are
> brief, minimally intrusive seizures but which are considered
> significant enough to invoke Fourth Amendment
> safeguards and thus must be supported by a reasonable
> suspicion of criminal activity.  Third, there are highly
> intrusive, full-scale arrests, which must be based on
> probable cause.

United States v. Poitier, 818 F.2d 679, 682 (8th Cir. 1987), cert. denied, 484 U.S. 1006
(1988), citing United States v. Wallraff, 705 F.2d 980, 988 (8th Cir. 1983); United

States v. Johnson, 326 F.3d 1018, 1021 (8th Cir. 2003), cert. denied, 540 U.S. 962 (2003).

The Defendants have argued that Harris's encounter with the Plaintiff, during the early morning hours of November 1, 2003, falls within the first of the three (3) tiers established by the opinions of the Supreme Court -- i.e., a consensual encounter that is "outside the scope of the Fourth Amendment." See, United States v. Poitier, supra at 682. We agree.

It is well settled that "law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." United States v. Drayton, 536 U.S. 194, 200 (2002); see also, United States v. Vera, 457 F.3d 831, 834-35 (8th Cir. 2006); United States v. Rayos-Parra, 312 F.3d 343, 346 (8th Cir. 2002). The Supreme Court has clarified as follows:

> [Q]uestioning, by itself, is unlikely to result in a Fourth Amendment violation. While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response. * * * [Citation omitted.] Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment.

I.N.S. v. Delgado, 466 U.S. 210, 216 (1984).

Thus, it is not a seizure for a police officer, in a public setting, to approach an individual, identify him- or herself as an officer, and ask the individual to step aside and talk to the detectives. See, Florida v. Bostick, 501 U.S. 429, 434 (1991), citing California v. Hodari D., 499 U.S. 621, 628 (1991); United States v. Vera, supra at 834-35, citing Florida v. Rodriguez, 469 U.S. 1, 5-6 (1984); United States v. Angulo-Guerrero, 328 F.3d 449, 450-51 (8th Cir. 2003).

The foregoing passage from I.N.S. v. Delgado makes two (2) important points that have been repeatedly emphasized in other cases. First, when determining whether a police-citizen encounter is consensual, and therefore, is not a "seizure" for Fourth Amendment purposes, a Court must look at all of the circumstances surrounding the encounter. See, Michigan v. Chesternut, 486 U.S. 567, 572 (1988)("any assessment as to whether police conduct amounts to a seizure implicating the Fourth Amendment must take into account all of the circumstances surrounding the incident in each individual case")(internal quotations omitted); United States v. Barry, 394 F.3d 1070, 1074-75 (8th Cir. 2005); United States v. Johnson, 326 F.3d 1018, 1021 (8th Cir. 2003)(question of seizure determined on case-by-case basis, as "no litmus-paper test exists for distinguishing a consensual encounter from a seizure."), cert. denied, 540

U.S. 962 (2003), citing <u>United States v. Ninety One Thousand Nine Hundred Sixty</u> <u>Dollars</u>, 897 F.2d 1457, 1461 (8th Cir. 1990).

Second, when determining whether an encounter is consensual, a Court should not consider the subjective beliefs of the particular individual who is challenging the constitutionality of the encounter, but must apply an objective standard, and consider how a "reasonable person" would have viewed the encounter.  See, <u>Florida v. Bostick</u>, supra at 434 ("So long as a reasonable person would feel free 'to disregard the police and go about his business * * * the encounter is consensual and no reasonable suspicion is required."), citing <u>California v. Hodari D.</u>, supra at 628; <u>United States v.</u> <u>Morgan</u>, 270 F.3d 625, 630 (8th Cir. 2001), cert. denied, 537 U.S. 849 (2002)("[A]n objective standard is employed to determine whether there has been a seizure," and thus "the question is whether a reasonable person in the same circumstance would have felt free to leave"); see also, <u>United States v. Love</u>, 2007 WL 28449 at * 3 (D. Minn., January 3, 2007); <u>United States v. Richardson</u>, 2006 WL 3061053 at *3 (D. Minn., October 26, 2006).  As summarized by our Court of Appeals, Courts must "inquire * * * whether all the circumstances involved in the officers' questioning * * * were so intimidating, threatening or coercive that a reasonable person would not have believed himself free to leave." <u>United States v. McKines</u>, 933 F.2d 1412, 1419

(8th Cir. 1991), cert. denied, 502 U.S. 985 (1991); see also United States v. Bryson,

110 F.3d 575, 579-80 (8th Cir. 1997)(same), cert. denied, 536 U.S. 963 (2002).

The Court of Appeals has identified several "[e]xamples of circumstances that

might indicate a seizure," rather than a consensual encounter, "even where the person

did not attempt to leave," namely:  "[i] the threatening presence of several officers, [ii]

the display of a weapon by an officer, [iii] some physical touching of the person of the

citizen, or [iv] the use of language or tone of voice indicating that compliance with the

officer's request might be compelled."  United States v. McKines, supra at 1415-16;

see, United States v. Jones, 269 F.3d 919, 925-26 (8th Cir. 2001)("Circumstances that

might indicate when an encounter becomes a seizure include the threatening presence

of several officers * * *or the use of language or tone of voice [which] indicat[es] that

compliance with the officer's request [will] be compelled."), citing United States v.

Hathcock, 103 F.3d 715, 718-19 (8th Cir. 1997).  In fact, our Court of Appeals has

stated that, "[w]ithout such circumstances, there could be no seizure as a matter of

law."  United States v. McKines, supra at 1425.

Here, viewing the Record in a light most favorable to the Plaintiff, as we must

for purposes of the Summary Judgment Motions, we find that Harris's encounter with

the Plaintiff, on November 1, 2003, was consensual, and therefore, outside of the

scope of the Fourth Amendment.   Viewed in totality, the undisputed facts do not

demonstrate that the Plaintiff was subjected to a seizure, at the time that he was

questioned by Harris.   As our Court of Appeals most recently reiterated, in United

States v. Flores-Sandoval, --- F.3d ---, 2007 WL 220225 at *2 (8th Cir., January 30,

2007):

> This Court considers the totality of the circumstances, "not
> one particular detail," to determine whether a seizure
> occurred.  See [United States v.] Johnson, 326 F.3d [1018,]
> 1022 [(8th Cir. 2003)].  Factors indicating a seizure are: the
> presence of several officers, a display of a weapon by an
> officer, physical touching of the person, or the "use of
> language or tone of voice indicating that compliance with
> the officer's request might be compelled."  [United States
> v.] Hathcock, 103 F.3d [715,] 718-19 [(8th Cir. 1997)],
> quoting United States v. White, 81 F.3d 775, 779 (8th Cir.
> 1996); [United States v.] Barry, 394 F.3d [1070,] 1075 [(8th
> Cir. 2005)].  A seizure occurs when the officer, "by means
> of physical force or show of authority, has in some way
> restrained the liberty" of a suspect.  Id. at 1074, quoting
> Terry [v. Ohio,] 392 U.S. [1,] 19 [(1968)].

Examining these factors fails to establish a seizure, as a matter of law.

First, Harris was alone when she approached the Plaintiff.   We recognize that

Marcus was close behind Harris at the time, but there is no evidence suggesting that

Marcus had any involvement in the initial encounter between Harris and the Plaintiff.

The fact that the Plaintiff was approached by only a single officer, Harris, diminishes

the likelihood that the Plaintiff, or a reasonable person in the Plaintiff's situation, would have felt restrained by Harris.  See, <u>United States v. White</u>, 81 F.3d 775, 799 (8th Cir. 1996)(in determining that criminal defendant's initial encounter with police detective was consensual, Court emphasized that defendant had conversed with only one officer, with other officers being passive observers), cert. denied, 591 U.S. 1011 (1996); <u>United States v. Dixon</u>, 51 F.3d 1376, 1379-80 (8th Cir. 1995)(Court found no seizure and emphasized that defendant had conversed with only one (1) officer).  Even if, as the Plaintiff suggests, he was approached by both Harris and Marcus "simultaneously," see, <u>Plaintiff's Memorandum</u>, supra at 2, that would not alter our analysis, as the presence of two (2) police officers is not dispositive of the consensual nature of an encounter.  See, <u>United States v. Locklin</u>, 943 F.2d 838, 839-40 (8th Cir. 1991)(no seizure when detectives approached defendant on sidewalk while uniformed officer waited in car at curb); see also, <u>United States v. Ceja-Tinajero</u>, 35 Fed.Appx. 284, 284-85 (8th Cir. 2002)(no seizure when defendant approached by two plain clothes officers who repeatedly identified themselves as law enforcement); <u>United States v. Johnson</u>, 2001 WL 1640041 at *4 (D. Minn., November 13, 2001)(no seizure when defendant approached by three officers), cert. denied, 540 U.S. 962 (2003).

Second, Harris did not activate any flashing lights, or any siren, when she approached the Plaintiff.  See, First Hearing T., at p. 11.  This factor reenforces our determination that a reasonable person in the Plaintiff's situation would not have felt coerced, or intimidated, by Harris's presence, or by her questions.  See, United States v. Barry, supra at 1075 (no seizure when officer approached defendant without activating emergency lights on squad car); United States v. Richardson, supra at *3 (no seizure when officer approached defendant on dark street at 1:40 o'clock a.m., shone light on him, and requested to speak with him);United States v. Marasco, 446 F. Supp. 2d 1073, 1079-80 (D. Neb. 2006)(reasonable person would feel free to leave when squad car approached without lights or siren); Dennen v. City of Duluth, 2002 WL 832593 at *5 (D. Minn., May 1, 2002)(finding "no objective indications that [officer] was asserting his authority," when he approached defendant without turning on patrol vehicle's lights or siren).

Third, there is no evidence so much as intimating that Harris displayed any weapon, or that she ever had any physical contact with the Plaintiff.  This circumstance further undermines the Plaintiff's contention that his encounter with Defendant Harris was a "seizure" covered by the Fourth Amendment.  See, United States v. Johnson, supra at *3 (no seizure when officer displayed, but did not draw,

gun); <u>United States v. Garcia</u>, 197 F.3d 1223, 1226 (8th Cir. 1999)(no seizure when officers did not touch defendant or block his path, did not have their holsters showing, did not speak in harsh tones or raise their voices); <u>United States v. Robinson</u>, 984 F.2d 911, 914 (8th Cir. 1993)(where detectives did not display their weapons or threaten to arrest suspect, or use physical force or show of authority against suspect, the District Court properly concluded that detectives' "continued questioning was a consensual encounter that did not constitute a <u>Terry</u> stop").

Fourth, there is no evidence suggesting that Harris employed any forceful language that a reasonable person would have found to be threatening or intimidating.[6]

---

[6] At the Plaintiff's first Omnibus Hearing in his State criminal case, Harris gave the following answers to questions that were put to her about her encounter with the Plaintiff:

Q:    And what do you say to the Defendant [i.e., the Plaintiff here]?
A:    I said, 'Hey, can I talk to you for a minute?'
Q:    How did he respond?
A:    He just stopped and stood there and looked at me.
Q:    Did he say I don't want to talk to you?
A:     No.
Q:    You were still in your squad car at that point?
A:     At that point, yeah.
Q:    Did you in any way order him to stop?
A:    No.
Q:    Did you say, 'Hey you, I want to talk to you?'
A:    No, I said, 'Hey, can I talk to you for a minute?'
Q:    Okay, did he indicate that he was reluctant to talk to

The Record shows that Harris merely rolled down the window, and asked the Plaintiff

to "hold on" or "hold up" because she wanted to ask him some questions.   See,

<u>Affidavit of Harris</u>, Exhibit 2, at unnumbered p. 4.   Although the employment of

language such as "hold on," or "hold up," plainly evinces Harris' interest in speaking

with the Plaintiff, someone might construe such a statement as a command, and not

---

you or anything?
A:   No, not at first he – he didn't.
Q:   What did you do then?
A:   I walked around to the side, and I asked him if he had been in a fight with his girlfriend tonight.  And he immediately was kind of irate with me and saying, 'I don't have a girlfriend.  I didn't get in a fight with anyone.'  And I just basically told him we had an assault in the area and I just wanted to, you know, check.  'You match [the] description of the male, and that's just what I'm here to do is just ask you if you were in a fight with your girlfriend tonight.'

<u>First Hearing T.</u>, at p. 12.

Harris provided essentially the same description of her encounter with the Plaintiff when she was cross-examined by defense counsel at the first Omnibus Hearing.  See, <u>id.</u>, at pp. 21-27.  When asked about how she might have reacted if the Plaintiff had tried to leave the area, Harris responded, "you know, the thing is that at that point he was cooperating with me.  There was no need for anything further because he was cooperating with me." <u>Id.</u>, at p. 27.

- 22 -

as an expression of interest.  Although not specifically urged by the Plaintiff, we address that question in the interests of completeness.

In <u>United States v. Angell</u>, 11 F.3d 806 (8th Cir. 1993), cert. denied, 512 U.S. 1239 (1994), an investigating officer observed a vehicle approach an intersection where the officer's patrol car was parked.  The officer shined his flashlight in the other car, and at its two (2) occupants.  While still in his squad car, the officer asked the two (2) men whether they had been drinking, as the officer was investigating a van that had been parked, and abandoned, in that intersection.  One of the occupants in the car answered "no."  "According to [the officer], he told the car's occupants:  'Stay there, I want to talk to you.'"  <u>Id.</u> at 807.  In contrast, one (1) of the occupants maintained that the officer said "Hold it right there," "I'm going to get out and come talk to you."  <u>Id.</u>  According to the other occupant, the officer said "Hold it right there, I want to talk to you guys."  <u>Id.</u>  In seeking to suppress evidence obtained in the following exchange, the question presented was whether a reasonable person would have felt free to disregard the officer's request.  The Court concluded that a consensual encounter was presented.

In so concluding, the Court explained:

> In this case, the events occurred on a rural public road in
> the presence of only one officer.  [The officer] did not turn

- 23 -

on his patrol car lights, did not block the pathway of [the occupants' car] did not draw a weapon, and did not physically touch the [occupants]. Granted [the officer]'s statement (whether "Stay there" or "Hold it right there") clearly indicated that he wanted the [occupants] to remain where they were so that he could talk with them. Nevertheless, given the lateness of the hour, the remoteness of the scene, and the unexplained presence of the unoccupied van, neither [the officer's] language nor his conduct constituted anything other than what a reasonable person would have construed as a consensual encounter between a law enforcement officer and a member of the public. Had [the officer] couched his request in more indirect language, such as, say, "Could I talk to you guys a minute," or "Would you hold up a minute, please," there would be no question about the consensual nature of the subsequent conversation between [the officer] and the [occupants]. In light of the totality of the circumstances, we conclude that [the officer's] actual language, although perhaps somewhat more peremptory than precatory in tone, did not convert what would clearly have been a consensual encounter into a seizure within the meaning of the Fourth Amendment.

Id. at 809-10, citing United States v. Jones, 990 F.2d 405, 408 (8th Cir. 1993), cert. denied, 510 U.S. 934 (1993); see also, United States v. Dockter, 58 F.3d 1284, 1286-87 (8th Cir. 1995), cert. denied, 516 U.S. 1122 (1996).

The facts of Angell closely parallel those presented here and, we find, the Court's holding there, to be controlling.

While every case has some unique facts, there are countless Federal cases in which Courts have reiterated that the Fourth Amendment does not come into play when a police officer simply approaches a citizen on a public street or other public

- 24 -

area, and asks the citizen for information or assistance.  See, e.g., <u>United States v.</u>
<u>Richardson</u>, supra at *3; <u>United States v. Vera</u>, supra at 834-35; <u>United States v.</u>
<u>Barry</u>, supra at 1074; <u>United States v. Angulo-Guerrero</u>, supra at 450-51; <u>United</u>
<u>States v. Green</u>, 52 F.3d 194, 197 (8th Cir. 1995)("A request for information does not
turn consensual questioning into an investigatory stop").  In short, a police officer can
walk up to a person in a public venue, and ask the persons questions, without violating
the Fourth Amendment.

Comparing the circumstances of this case to other cases in which consent has
been an issue, it is plain that the Plaintiff's encounter with Harris must be viewed as
consensual.  In <u>Michigan v. Chesternut</u>, supra at 569, for example, police officers in
a squad car chased a man who started running away from them when he saw their car.
The police drove after the man, even though they had no knowledge that he had been
engaged in any criminal activity, and they later saw him drop something that turned
out to be a controlled substance.  <u>Id.</u>  The Supreme Court concluded that chasing the
man did not constitute a "seizure" governed by the Fourth Amendment.  <u>Id.</u> at 575
("While the very presence of a police car driving parallel to a running pedestrian could
be somewhat intimidating, this kind of police presence does not, standing alone,
constitute a seizure.").  The Court explained that "the police conduct here -- a brief

acceleration to catch up with respondent, followed by a short drive alongside him -- was not 'so intimidating' that respondent could reasonably have believed that he was not free to disregard the police presence and go about his business * * *," [citation omitted], and "[t]he police therefore were not required to have 'a particularized and objective basis for suspecting [respondent] of criminal activity,' in order to pursue him." Id. at 576.

In I.N.S. v. Delgado, supra at 212-13, Federal agents questioned workers at a Southern California factory, during a search for illegal aliens. Four (4) of the workers filed a lawsuit, claiming that the questioning constituted an illegal Fourth Amendment seizure, because the agents had no reasonable suspicion that the four (4) workers were involved in any criminal activity. See, id. at 213. Even though agents were posted at the exits of the factory, so that workers could be questioned if they tried to leave, the Supreme Court rejected the workers' Fourth Amendment claims, finding that "the mere possibility that they would be questioned if they sought to leave the buildings should not have resulted in any reasonable apprehension by any of them that they would be seized or detained in any meaningful way." Id. at 219. The Court concluded that the questioning of the workers "were classic consensual encounters rather than Fourth Amendment seizures." See, id. at 221.

In <u>Florida v. Royer</u>, 460 U.S. 491 (1983), <u>United States v. Mendenhall</u>, 446 U.S. 544 (1980), and <u>Florida v. Rodriguez</u>, 469 U.S. 1 (1984), law enforcement agents approached individuals in airports, and advised that they wanted to ask them some questions.  In each of those cases, the Supreme Court found that the agents did not effect a Fourth Amendment seizure, when they approached the individuals and said they wanted to question them.  See, <u>Mendenhall</u>, supra at 553 ("We adhere to the view that a person is "seized" only when, by means of physical force or a show of authority, his freedom of movement is restrained * * * [o]nly when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards.").

Our Court of Appeals has also repeatedly found that law enforcement officials have not effected a Fourth Amendment seizure when they have approached citizens and tried to question them.  See, e.g., <u>United States v. Green</u>, supra at 197; <u>United States v. Hernandez</u>, 854 F.2d 295, 297 (8th Cir. 1988); <u>United States v. Archer</u>, 840 F.2d 567, 572 (8th Cir. 1988), cert. denied, 488 U.S. 941 (1988); <u>United States v. McKines</u>, supra at 1422-23; <u>United States v. Poitier</u>, supra at 682-83; <u>United States v. Campbell</u>, 843 F.2d 1089, 1092-93 (8th Cir. 1988); <u>United States v. Morgan</u>, supra at 630; <u>United States v. Bryson</u>, supra at 579-80; <u>United States v. Robinson</u>, supra at 913-14.  Comparing the facts of those cases, to the facts here, strengthens our

conclusion that the Plaintiff's encounter with Harris was consensual, and therefore, provides no grounds for a Fourth Amendment civil rights claim.

Most recently, in United States v. Flores-Sandoval, supra, the defendant, an illegal alien, was released from fourteen (14) months of confinement, after his statements and fingerprints were suppressed.  Upon leaving the jail, an agent with the Bureau of Immigration and Customs Enforcement ("ICE") approached the defendant on the sidewalk, identified himself, and asked the defendant for his name, which was given.  After additional questions, the defendant admitted that he was in the country illegally, and he was arrested.  The defendant contended that the encounter with the ICE agent was a seizure, but the Court was not so persuaded, even though the agent had not informed the defendant that he did not need to respond to the questions, did not ask the defendant if he was willing to answer questions, displayed his credentials as a show of authority, and questioned the defendant in close proximity to the door to the jail.  The Court concluded "that the atmosphere was not so intimidating or threatening that a reasonable person would not have believed himself free to leave." Id. at *3.  The very same may be said here.

The Plaintiff may believe that he has identified genuine issues of material fact, which preclude Summary Judgment, because his recollection of his encounter with

- 28 -

Harris is somewhat different from the version provided by Harris at the State Omnibus Hearings, and in Harris' Affidavit in this case.  However, the Plaintiff has offered no evidence contradicting the evidentiary materials that have been filed by the Defendants.  Furthermore, none of the Plaintiff's non-evidentiary submissions -- such as his original Complaint, Memorandum of Law, and various Motions -- suggests that Harris's version of the facts is inaccurate in any material respect.[7]

Though there is no evidence in the Record concerning the Plaintiff's state of mind, to the extent that the Plaintiff argues that his own subjective state of mind is relevant evidence, and creates a genuine issue of material fact about whether his encounter with Harris was consensual, he is mistaken.  As we have already addressed, the issue of consent is judged by an objective, reasonable person standard, and not subjective, personal one.   See, <u>Michigan v. Chesternut</u>, supra at 574 ("This 'reasonable person' standard * * * ensures that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual being

---

[7]The only exception is that the Plaintiff suggests that Harris and Marcus approached him at the same time, "coming to an abrupt stop simultaneously in separate squad cars, [and] emerging from their vehicles to approach plaintiff from the front and behind to restrict his movements."  See, <u>Plaintiff's Memorandum</u>, supra at p. 2.  We note that we have already determined that the Plaintiff was not seized at the time of his initial encounter with Harris, and we base that determination on the totality of the circumstances, rather than on the exact number of police officers that were present when the Plaintiff was initially approached.

approached"). Whether the encounter between Harris and the Plaintiff was consensual is, ultimately, an issue of law, not of fact, which can properly be decided on Summary Judgment, based on the facts of Record, without regard to the Plaintiff's state of mind. See, <u>United States v. McKines</u>, supra at 1424-25 ("The question of seizure, however, which rests on a reasonable person's belief about the surrounding circumstances, is <u>a legal characterization</u>")[emphasis added].

We recognize, of course, that, in the Plaintiff's State criminal case, the State Court granted the defense's Motion to Suppress the evidence obtained during the course of the Plaintiff's encounter with the Defendants, and dismissed the charges against the Plaintiff. See, <u>Omnibus Order</u>, <u>Docket No. 23-5</u>. Although the Plaintiff does not assert a <u>res judicata</u>, or collateral estoppel effect, which might be argued to arise from the State Court's Order, see, e.g., <u>Patzner v. Burkett</u>, 779 F.2d 1363, 1369 n. 7 (8th Cir. 1985), even if he had, we would find no basis to apply those doctrines to this case, as the State Court simply addressed the facts, and did not make plain whether the decision reached was predicated on State or Federal law. Although the State Court did reference "<u>Terry</u>," <u>Omnibus Order</u>, <u>Docket No. 23-5</u>, at p. 2, the Court cited no legal authority, State or Federal, to disclose whether it was addressing the

- 30 -

issue under Federal law, or Minnesota's analogue to the Federal rule.[8]  Accordingly, we have no grounds to believe that the State Court was ruling on the basis of Federal constitutional law.  Simply stated, there is nothing in this Record to so much as intimate that the State Court ever considered what we find to be dispositive here -- namely, that the Plaintiff's initial encounter with Harris was consensual, under Federal law, and therefore, wholly outside of the scope of the Fourth Amendment.

Even if we concluded that Harris' comment to "hold on," or "hold up," was sufficient to invoke the Fourth Amendment's protections, so as to engage a <u>Terry</u> stop analysis, under the law of this Circuit, and of several others, "a reasonable but mistaken belief may justify an investigative stop." <u>United States v. Bailey</u>, 417 F.3d 873, 877 (8th Cir. 2005), cert. denied, --- U.S. ---, 126 S.Ct. 1894 (2006), citing, and

---

[8]On occasion, the Minnesota Supreme Court has determined that the Minnesota Constitution provides protections which the United States Supreme Court has determined differently.  For example, we have some doubt that the Minnesota Supreme Court accepts what it has referred to as the "so-called consensual encounter," <u>State v. George</u>, 557 N.W.2d 575, 580 (Minn. 1997), and the Court has expressly rejected a "good faith" exception to the <u>Terry</u> doctrine.  See, <u>State v. Anderson</u>, 683 N.W.2d 818, 823-24 (Minn. 2004).  Accordingly, in finding that Federal law, which is the predicate for a Section 1983 claim, see, <u>DeArmon v. Burgess</u>, 388 F.3d 609, 612 (8th Cir. 2004) ("[V]iolation of state law, without more, does not state a [§1983] claim."), quoting <u>Collins v. Bellinghausen</u>, 153 F.3d 591, 596 (8th Cir. 1998), has not been violated, we express no view as to the propriety of the State Court's decision under the Minnesota Constitution, for we simply note that, given the differences in those laws, as well as the absence of any showing that the State Court relied on Federal law, the doctrines of <u>res judicata</u>, and collateral estoppel, cannot apply.

quoting, <u>United States v. Ornelas-Ledesma</u>, 16 F.3d 714, 718 (7th Cir. 1994)("A mistaken premise can furnish grounds for a Terry stop, if the officers do not know that it is mistaken and are reasonable in acting upon it."), judgment vacated on other grounds, 517 U.S. 690 (1996); cf., <u>United States v. Sparks</u>, 37 Fed.Appx. 826, 829 (8th Cir. 2002); <u>United States v. Lopez-Valdez</u>, 178 F.3d 282, 289 (5th Cir. 1999)("[E]vidence is not to be suppressed * * * where it is discovered by officers in the course of actions that are taken in good-faith and in the reasonable, though mistaken, belief that they are authorized."), quoting <u>United States v. De Leon-Reyna</u>, 930 F.2d 396, 400 (5th Cir. 1991); <u>United States v. Garcia-Acuna</u>, 175 F.3d 1143, 1147 (9th Cir. 1999)("'A mistaken premise can furnish grounds for a Terry stop, if the officers do not know that it is mistaken and are reasonable in acting upon it.'"), quoting <u>United States v. Shareef</u>, 100 F.3d 1491, 1505 (10th Cir. 1996), quoting, in turn, <u>United States v. Ornelas-Ledesma</u>, supra at 718; <u>Houston v. Clark County Sheriff Deputy John Does 1-5</u>, 174 F.3d 809, 814 (6th Cir. 1999)(mistake leading to traffic stop did not rise to "constitutional dimension.").

Here, the State Court made the following findings:

> The Court continues to find that the jacket colors could have been easily mixed up in the officer's [i.e., Harris'] mind.

*     *     *

> The officer [i.e., Harris] was acting in good faith; but there
> was simply not enough basis on these facts to constitute a
> "reasonable suspicion" that the Defendant [i.e., the Plaintiff
> here] was the suspect.  This would be so even if the jacket
> color had been right.  The Court is not finding that its view
> of the facts has changed significantly since the last Order.
> The Court is concluding that it was mistaken in its analysis
> of the facts and its prior conclusion.

Omnibus Order, Docket No. 23-5, at pp. 1-3.

Plainly, the State Court determined, and we conclude as well, that though mistaken,

Harris reasonably believed that she was investigating in accordance with the

dispatcher's description of the suspect.  To the extent that the State Court concluded

that, even if there were no mistake as to the color of the jacket the suspect wore, there

was an insufficient showing of a reasonably articulable suspicion, so as to allow a

Terry stop, the Court had to be viewing the evidence through the aperture of State law

for, as we have shown, the showings unquestionably satisfy Federal law, whether they

were mistaken or not.[9]  Simply stated, when the undisputed facts are viewed in a light

---

[9]We note, for example, that under the law of Minnesota, as construed solely in the context of the Minnesota Constitution, the Minnesota Supreme Court has rejected the application of a good faith exception to the Fourth Amendment, which the United States Supreme Court embraced in United States v. Leon, 468 U.S. 897, 926 (1984). See, e.g., State v. Zanter, 535 N.W.2d 624, 634 (Minn. 1995); Garza v. State, 632 N.W.2d 633, 639-40 (Minn. 2001).  Unfortunately for the Plaintiff's Section 1983 claim, even if we concluded that the Defendants violated the Minnesota Constitution -- an issue not before us -- the violation would not be actionable under Section 1983.

most favorable to the Plaintiff, the Record unqualifiedly establishes, as a matter of law, that the encounter between the Plaintiff and Harris was consensual but, even if it were a Terry stop, no violation of Federal law occurred, even where, as here, Harris was mistaken in the factual basis upon which she effected the stop.  Therefore, we find no Fourth Amendment violation, and we recommend that the Summary Judgment Motion of Harris, as to the Plaintiff's Fourth Amendment claim, should be granted.

Finally, we have considered whether the facts of Record could support an actionable claim against Harris, based upon the Fourteenth Amendment's Equal Protection Clause.  The Plaintiff argues that Harris violated the Equal Protection Clause, because she allegedly stopped him solely on account of his race.  The Plaintiff has offered nothing to support this theory, and the facts of the case completely dispel his claim of racial discrimination.

The Fourteenth Amendment's Equal Protection Clause requires Government actors to treat persons, who are similarly situated, alike.  See, City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 439 (1985); see also, Creason v. City of

---

See, Marler v. Mo. State Bd. of Optometry, 102 F.3d 1453, 1457 (8th Cir. 1996)("We have stated many times [] that 'a violation of state law, without more, does not state a claim under the federal Constitution or 42 U.S.C. §1983.'"), quoting Bagley v. Rogerson, 5 F.3d 325, 328 (8th Cir. 1993); Weir v. Nix, 114 F.3d 817, 821 n. 7 (8th Cir. 1997).

Washington, 435 F.3d 820, 823 (8th Cir. 2006).  As a threshold matter, the Plaintiff

must show that he was treated differently than those similarly situated, see, Johnson

v. City of Minneapolis, 152 F.3d 859, 862 (8th Cir. 1998), and, if he fails to make such

a showing, he does not have a viable Equal Protection claim.  See, Klinger v. Dept.

of Corrections, 31 F.3d 727, 731 (8th Cir. 1994), cert. denied, 513 U.S. 1185 (1995).

Harris readily acknowledges that race played a role in her decision to approach

the Plaintiff, because the suspect she was seeking had been identified as a Black male.

If the Plaintiff was a member of some other race, then he might have a plausible race

discrimination argument, because his race would not have matched the suspect's.  But

again, the suspect, who Harris was seeking, had been described as a Black male, so

she obviously should have been looking for an African-American man, such as the

Plaintiff.  See, Jefferson v. City of Omaha Police Dept., 335 F.3d 804, 807 (8th Cir.

2003)(no discriminatory effect or purpose when officers targeted defendant based on

victim's description which included race and gender), cert. denied, 540 U.S. 1178

(2004); United States v. Frazier, 2000 WL 34030864 at *3 (N.D. Iowa, September 20,

2000); see also, Brown v. City of Oneonta, New York, 221 F.3d 329, 337-38 (2d Cir.

2000)(same), cert. denied, 534 U.S. 816 (2001).  Harris's attempt to talk to the

Plaintiff was not racial discrimination, it was simply an exercise of diligent police practices.

2.     <u>The Claims Against Defendant Marcus</u>.  The Plaintiff claims that Marcus violated his constitutional rights by placing him under arrest, without probable cause.  We find the claim to be unsustainable, because Marcus had ample probable cause to arrest the Plaintiff.

"The Fourth Amendment includes the right to be free from arrest without probable cause." <u>Lambert v. City of Dumas</u>, 187 F.3d 931, 935 (8th Cir. 1999), citing <u>Ripson v. Alles</u>, 21 F.3d 805, 807-08 (8th Cir. 1994); see also, <u>Daniels v. Downing</u>, 2003 WL 252114 at *3 (D. Minn., January 30, 2003).  "Probable cause to arrest exists if the facts and circumstances known to an officer would warrant a person of reasonable caution in believing that the suspect has, is, or will soon, commit an offense." <u>United States v. James</u>, 2007 WL 14338 at *10 (D. Minn., January 3, 2007), citing <u>United States v. McKay</u>, 431 F.3d 1085, 1090 (8th Cir. 2005); <u>United States v. Adams</u>, 346 F.3d 1165, 1169 (8th Cir. 2003).  An arrest does not take place until a person is seized, see, <u>United States v. Carpenter</u>, 462 F.3d 981, 985 (8th Cir. 2006), which occurred here, when Marcus approached the Plaintiff, placed his hands behind

his back, and informed him that he was under arrest.  See, <u>United States v. Pratt</u>, 355 F.3d 1119, 1122 (8th Cir. 2004); <u>United States v. Vera</u>, supra at 834-35.

The evidence demonstrates, without competent contradiction, that Marcus observed the Plaintiff drop something to the ground, which Marcus then retrieved, and discovered to be crack cocaine.  See, <u>First Hearing T.</u>, pp. 41-43.  We find that those facts gave Marcus probable cause to arrest the Plaintiff.[10]  In <u>United States v. Dawdy</u>, 46 F.3d 1427 (8th Cir. 1995), our Court of Appeals found that officers had probable cause to arrest a defendant who dropped a key out of the window of his car, which landed next to a pouch that proved to contain illegal drugs.  The Court found that the seizure of the pouch did not violate the Fourth Amendment, as the defendant could have no legitimate expectation of privacy on the surface of the pavement near his car, and the close proximity, between the car and the pouch, created a "nexus" between the pouch and the defendant.  <u>Id.</u>; <u>United States v. Segars</u>, 31 F.3d 655, 658 (8th Cir. 1994); <u>United States v. Buie</u>, 2006 WL 157916 at *6 (E.D. Mo., June 1, 2006).

---

[10]If the Plaintiff were claiming that Marcus violated his constitutional rights by reason of the Plaintiff's encounter with Harris, that claim would fail, because there is no evidence suggesting that Marcus was involved in questioning the Plaintiff about the domestic assault.  Marcus merely observed the Plaintiff drop a napkin, which he determined to contain crack cocaine, and then immediately arrested the Plaintiff, based solely on that observation -- and not because of anything related to the assault.

The Plaintiff seeks to elude Summary Judgment, by arguing that Marcus, and Harris, have offered inconsistent explanations as to where Marcus was, and what he was doing, immediately before the Plaintiff's arrest.  According to the Plaintiff:

> The record reflects conflicting accounts of the event in the officers' incident reports and testimonies as to:  (1) Whether Marcus was walking behind plaintiff or sitting in his vehicle when plaintiff allegedly dropped the napkin [containing the crack cocaine], (2) whether the napkin had been in plaintiff's hand or had he taken it out of his pocket and, (3) whether Marcus arrived 10 to 15 seconds after Harris made contact with plaintiff or were they bumper to bumper coming to a stop.

See, Plaintiff's Memorandum, supra at p. 6.

In addition, the Plaintiff's Memorandum contains an obscure assertion that "he denies the officers['] allegations of him dropping the tissue containing the crack cocaine." See, Plaintiff's Memorandum, supra at p. 3.  Those alleged inconsistencies are minor and inconsequential, and do not create any "genuine issue of material fact" that would preclude Summary Judgment.

Here, the Record shows that Marcus saw the Plaintiff drop something on the ground which Marcus reasonably believed, based on his experience as a police officer, to be crack cocaine, and that, by itself, was enough to give Marcus probable cause to make a legal arrest.  The Plaintiff has not introduced any evidence which would contradict that finding, which is supported by all of the uncontroverted evidence in the

Record before us.  Moreover, the Plaintiff does not deny that Marcus actually found a napkin, which was subsequently determined to contain crack cocaine, on the ground right next to the Plaintiff, as he stood talking to Harris.

In sum, based upon the totality of the Record, we conclude, as a matter of law, that Marcus had probable cause to believe that the Plaintiff had violated State law by possessing crack cocaine, and therefore, we find that Marcus did not violate the Plaintiff's constitutional rights by arresting him.

3.     <u>The Claims Against the Remaining Defendants</u>.  The Plaintiff's claims against the remaining Defendants -- the City, Waller, and Behning -- presuppose that Harris, and/or Marcus, violated the Plaintiff's constitutional rights. The Plaintiff claims that the City, Waller, and Behning, violated his constitutional rights by failing to properly train and supervise Harris, and Marcus, so that they would not violate his constitutional rights, and also, by failing to adequately investigate and discipline Harris, and Marcus, they condoned the alleged violations of his constitutional rights by those two (2) officers.  Since the Plaintiff's civil rights claims against Harris and Marcus have no merit, as a matter of law, the Plaintiff's derivative claims against the City, Waller, and Behning, are likewise unsustainable.  See, <u>City of Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986)("If a person has suffered no

constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point."); Wilson v. Spain, 209 F.3d 713, 717 (8th Cir. 2000) (where plaintiff's Fourth Amendment claims against individual police officer were dismissed, "[i]t necessarily follow[ed]" that his derivative Federal claims against the city and police chief were "dead in the water"); Schulz v. Long, 44 F.3d 643, 650 (8th Cir. 1995)("It is the law in this circuit * * * that a municipality may not be held liable on a failure to train theory unless an underlying Constitutional violation is located."); Abbott v. City of Crocker, Mo., 30 F.3d 994, 998 (8th Cir. 1994)("The City cannot be liable in connection with either the excessive force claim or the invalid arrest claim, whether on a failure to train theory or a municipal custom or policy theory, unless * * * [an individual officer] is found liable on the underlying substantive claim."); see also, Curley v. Village of Suffern, 268 F.3d 65, 71 (2d Cir. 2001)("[A] municipality cannot be liable for inadequate training or supervision when the officers involved in making an arrest did not violate the plaintiff's constitutional rights"); Dry v. City of Durant, 2000 WL 1854140 at *6 (10th Cir., December 19, 2000)(Table Decision)("Because the claims against the supervisory defendants are derivative in nature, those claims cannot survive the dismissal of the claims against the officer

defendants."). Therefore, we recommend that the Defendants' Motions for Summary Judgment be granted in all respects.[11]

NOW, THEREFORE, It is –

RECOMMENDED:

1.  That the Motions to Dismiss, or in the alternative for Summary Judgment, of the Defendant City of Duluth, Patricia Behning, and Roger Waller [Docket Nos. 14], be granted.

2.    That Motion of the Defendants Shana Harris, and Dale Marcus, for Summary Judgment [Docket No. 20], be granted.

3.  That the Plaintiff's Motion for Summary Judgment, [Docket No. 27], be denied.

---

[11]The Plaintiff also contends that it is "essential" that he be allowed to conduct further discovery in order to "examine prior civilian complaints, internal disciplinary action, and/or criminal prosecution for other incidents which defendant officers has [sic] been the subject in, to show that the municipality was put on notice of the propensity for objectionable character traits of the officer that required discipline, reassignment, or retraining * * *." See, Plaintiff's Memorandum, supra at p. 9. However, having determined that Plaintiff's derivative claims are unsustainable for the reasons we have stated, we find that further discovery could not possibly assist him in advancing those claims.

4.  That this action be dismissed with prejudice.


Dated:  January 31, 2007                    s/Raymond L. Erickson
                                            Raymond L. Erickson
                                            CHIEF U.S. MAGISTRATE JUDGE


## NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and

D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by

filing with the Clerk of Court, and by serving upon all parties **by no later than**

**February 16, 2007**, a writing which specifically identifies those portions of the

Report to which objections are made and the bases of those objections.  Failure to

comply with this procedure shall operate as a forfeiture of the objecting party's right

to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a

Hearing, then the party making the objections shall timely order and file a complete

transcript of that Hearing by no later than **February 16, 2007**, unless all interested

parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to

review the transcript in order to resolve all of the objections made.